**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
ANTHONY LAUDADIO,

                              Plaintiff,

              - against -

MIKE JOHANNS,
SECRETARY OF AGRICULTURE,

                              Defendant.
----------------------------------------------------------X

**OPINION & ORDER**

07-CV-782 (CBA) (RER)

**RAMON E. REYES, JR., U.S.M.J.:**

## INTRODUCTION

On February 23, 2007, plaintiff Anthony Laudadio brought this action for violations of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII")

against Mike Johanns, in his official capacity as Secretary of the United States Department of

Agriculture ("defendant").  Laudadio alleges that defendant discriminated against Laudadio on

the basis of his race (white) and national origin (Italian-American) and retaliated against him for

seeking Equal Employment Opportunity ("EEO") counseling and filing a complaint with the

Equal Employment Opportunity Commission ("EEOC").[1]

On August 25, 2008, defendant moved for summary judgment, arguing that plaintiff

failed to (1) exhaust his administrative remedies and timely bring this action as to his first EEO

complaint, (2) contact an EEO counselor timely regarding his second EEO complaint, and (3)

---

[1]  In August 2007, the parties stipulated to dismiss with prejudice plaintiff's other claims
under the New York State Human Rights Law, Executive Law § 296 and the Family and Medical
Leave Act, 29 U.S.C. §§ 2601 *et seq.*  (Dkt Nos. 8, 9.)

establish his retaliation claim.[2]  For the reasons set forth below, the motion is denied in its entirety.

**FACTS**

Plaintiff Anthony Laudadio is currently employed by the United States Department of Agriculture's ("USDA") Food Safety Inspection Service ("FSIS") as a Consumer Safety Inspector.  (Defendant's Amended[3] Statement of Undisputed Facts pursuant to Local Civil Rule 56.1 ("Def.'s 56.1 Stmt.") ¶ 1.)[4]  Plaintiff has worked in this position since June 1990.  (*Id.* ¶ 2.) He is responsible for inspecting meat processing plants and distributors throughout the five boroughs of New York City.  (*Id.* ¶ 3.)  Inspectors are assigned to a certain plant or distributor on a four-month basis (or, according to plaintiff, on a six-month basis as of 2002).  (Def.'s 56.1 Stmt. ¶ 4; Plaintiff's Rule 56.1 Counterstatement of Material Facts ("Pl.'s 56.1 Stmt.") ¶ 4.) Along with the location change, an inspector's supervisor also changes on a four or six-month basis.  (Def.'s 56.1 Stmt. ¶ 5; Pl.'s 56.1 Stmt. ¶ 5.)  During the relevant time period, plaintiff had three direct supervisors: Salah Ibrahim ("Ibrahim"), Dr. Mohammad Qureshi ("Dr. Qureshi"), and Anthony Rossano ("Rossano"); and one Deputy District Manager: Michael Washington. (Def.'s 56.1 Stmt. ¶¶ 6–7.)

---

[2]  Pursuant to 28 U.S.C. § 636(c), the parties have consented to my jurisdiction to decide the motion.

[3]  Defendant amended his original Rule 56.1 Statement to correct a clerical error.

[4]  Pursuant to Local Rule 56.1(c), unless specifically controverted, material facts set forth in defendant's Rule 56.1 Statement are deemed admitted.  Local Rule 56.1(c).

## Laudadio's First EEO Complaint

In December 2000, plaintiff's wife was diagnosed with cancer, and unfortunately passed away on May 25, 2001. (Def.'s 56.1 Stmt. ¶¶ 8–9.) Because of his increased child care responsibilities, plaintiff was on leave from January 2001 until September 2001. (Def.'s 56.1 Stmt. ¶ 10.) At some point during that period, plaintiff exhausted his sick and annual leave, so he applied for and was placed on the leave donor plan, a pool which allows employees to donate their annual leave for use by colleagues in need. (Def.'s 56.1 Stmt. ¶ 11; Pl.'s 56.1 Stmt. ¶ 11.)

After returning to work in September 2001, plaintiff had no difficulty obtaining accommodations to his work schedule. (Def.'s 56.1 Stmt. ¶ 13.) However, in July 2003, plaintiff made a verbal request (and according to plaintiff, received a verbal approval) to exchange work assignments with a co-worker named Frank Lenna. (Def.'s 56.1 Stmt. ¶ 14; Pl.'s 56.1 Stmt. ¶ 14.) Plaintiff wanted to exchange assignments with Lenna in order to meet plaintiff's child care demands more easily (Lenna's assignment would have spared Laudadio overtime assignments and a lengthy commute to the Bronx from Laudadio's residence in the southern most part of Brooklyn). (Def.'s 56.1 Stmt. ¶ 15; Pl.'s 56.1 Stmt. ¶ 15; Declaration of Neil M. Frank in Opposition to Defendant's Motion for Summary Judgment ("Frank Decl."), Ex. P. )

Plaintiff's union contract required employees to submit requests for assignment exchanges to their immediate supervisor(s) in writing at least four weeks in advance. (Def.'s 56.1 Stmt. ¶ 16; Pl.'s 56.1 Stmt. ¶ 16.) Dr. Qureshi and Ibrahim were the two supervisors whose permission plaintiff needed. (*See* Def.'s 56.1 Stmt. ¶ 16, 19, 21; Pl.'s 56.1 Stmt. ¶ 18.) Defendant claims that Laudadio failed to comply with this requirement because he submitted his

written request via email less than four weeks before the proposed assignment exchange was to occur. (Def.'s 56.1 Stmt. ¶¶ 17, 18; Pl.'s 56.1 Stmt. ¶¶ 17, 18.) Plaintiff claims that he "wrote" his email request four weeks in advance, but contends that the e-mail arrived three days late due to a "black out." (Pl.'s 56.1 Stmt. ¶¶ 17, 18.) Laudadio also contends that, ordinarily, FSIS would readily waive the written requirement. (Pl.'s 56.1 Stmt. ¶ 16.) In any event, at some point, plaintiff was informed that Dr. Qureshi denied the exchange request because it was not made in compliance with the four-week notice provision in the union contract. (Def.'s 56.1 Stmt. ¶ 22; Pl.'s 56.1 Stmt. ¶ 22.)

On September 12, 2003, plaintiff requested EEO counseling based on the denial of his request for assignment exchange, claiming that the denial was a result of race and national origin discrimination. (Def.'s 56.1 Stmt. ¶ 23; Pl.'s 56.1 Stmt. ¶ 23.) On January 30, 2004, plaintiff filed a formal EEO complaint alleging discrimination on the basis of race (white) and national origin discrimination (Italian-American), and reprisal for plaintiff's informal EEO counseling. (Def.'s 56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶ 24.) On April 9, 2004, the USDA accepted and referred for investigation plaintiff's claim that he had been subjected to harassment (based on prior EEO activity) and was discriminated against on the basis of race, national origin, and family status when: (1) on August 30, 2003, he was denied his assignment-exchange request, (2) from July 2003 to January 2004, he was subjected to ethnically derogatory remarks, (3) in September 2003 he was threatened with being reassigned to a Long Island duck farm, (4) from October through November 2003, he was denied certain leave, and (5) from September 2003 through January 2004, he was denied performance appraisals. (Def.'s 56.1 Stmt. ¶ 25; Pl.'s 56.1 Stmt. ¶ 25.)

On August 15, 2004, Laudadio requested a hearing before the EEOC. (Def.'s 56.1 Stmt. ¶ 26; Pl.'s 56.1 Stmt. ¶ 26.) On October 19, 2004, the law firm of Zabell & Associates, LLP appeared on plaintiff's behalf in connection with the EEOC case. (Def.'s 56.1 Stmt. ¶ 27; Pl.'s 56.1 Stmt. ¶ 27.) On October 20, 2004, plaintiff failed to appear at a deposition that had been noticed by the USDA on October 7, 2004. (Def.'s 56.1 Stmt. ¶ 28; Pl.'s 56.1 Stmt. ¶ 28; Frank Decl., Ex. C at 2.) On October 21, 2004, the USDA moved to compel discovery, impose sanctions, and disqualify plaintiff's counsel. (Frank Decl., Ex. C at 2.) On November 3, 2004, plaintiff opposed the motion, arguing that the deposition was improperly noticed and his failure to appear was not in bad faith. (*Id.*) He also stated his intent to file suit in federal district court. (*Id.*)

On December 6, 2004, the EEOC Administrative Law Judge ("ALJ") issued a decision on the USDA's motion. (*Id.*) The ALJ found that the USDA had properly noticed the deposition, the plaintiff did not have a good cause for failing to appear, and it was appropriate to draw an adverse inference against the plaintiff on that basis. (*Id.*) The ALJ did not disqualify plaintiff's counsel. (*Id.*) The ALJ also indicated that if plaintiff wanted to withdraw his EEOC complaint, such a request must be submitted in writing. (*Id.*) Thereafter, the EEOC would dismiss the case and return it to the USDA's jurisdiction for a Final Agency Decision ("FAD") on the merits. (*Id.*)

On December 15, 2004, plaintiff's counsel withdrew his request for a hearing and requested a FAD. (Def.'s 56.1 Stmt. ¶ 29; Pl.'s 56.1 Stmt. ¶ 29.) On December 17, 2004, the ALJ dismissed Laudadio's request for an EEOC hearing and returned the case to the USDA for further action. (Def.'s 56.1 Stmt. ¶ 30; Pl.'s 56.1 Stmt. ¶ 30.) The USDA did not issue its FAD

with respect to Laudadio's first EEO complaint until August 21, 2007, almost six months after

Laudadio commenced this action in federal court. (*See* Frank Decl., Ex. E.; Dkt No. 1.) The

FAD dismissed the claim pursuant to 29 C.F.R. § 1614.107(a) (3) as a "compliant that is the

basis for a pending civil action in a United States District Court." (Frank Decl., Ex. E.) *See also*

29 C.F.R. § 1614.107(a) (3) (2007).

### Laudadio's Second EEO Complaint

Between April 19, 2004 and July 20, 2004, plaintiff took unscheduled leave (either sick

or annual) on approximately thirty occasions. (Def.'s 56.1 Stmt. ¶ 32; Pl.'s 56.1 Stmt. ¶ 32.)

Plaintiff claims that the vast majority of these occasions were authorized. (Pl.'s 56.1 Stmt. ¶ 32.)

On May 13 and July 16, 2004, Ibrahim counseled and warned plaintiff about his use of leave

time. (Def.'s 56.1 Stmt. ¶¶ 33–34; Pl.'s 56.1 Stmt. ¶¶ 33–34.) On July 22, 2004, Ibrahim gave

plaintiff a Leave Restriction Notice limiting his use of unscheduled annual leave and requiring

plaintiff to request annual leave at least as far in advance as the amount of leave requested,

except in emergency situations ("Leave Restriction"). (Amended Declaration of Assistant United

States Attorney Susan Riley in Support of Motion for Summary Judgment ("Riley Decl."), Ex.

17.) The notice further stated that sick leave will be granted only upon submission of a medical

certificate, while emergency annual leave will require proof of an emergency situation. (*Id.*) The

Leave Restriction Notice also informed plaintiff that taking leave without proper approval would

be considered Absent Without Leave ("AWOL"). (*Id.*; Def.'s 56.1 Stmt. ¶ 39; Pl.'s 56.1 Stmt. ¶

39.)

Plaintiff claims that on July 23, 2004, he telephoned Arthur Simmons, an FSIS EEO

counselor to complain about the Leave Restriction Notice. (Def.'s 56.1 Stmt. ¶ 45; Pl.'s 56.1

Stmt. ¶ 45.)  On the same day, plaintiff "emailed Victor Betancur, the EEO counselor assigned to his first EEO complaint."  (Def.'s 56.1 Stmt. ¶ 46; Pl.'s 56.1 Stmt. ¶¶ 46–47.)  Because he had not received a reply, on August 25, 2004, Laudadio sent Betancur a follow-up email entitled "previous eeo counseling," requesting that Betancur contact plaintiff on his cell phone.  (Def.'s 56.1 Stmt. ¶ 48; Pl.'s 56.1 Stmt. ¶ 48.)

On September 5, 2004, plaintiff rotated from Ibrahim's to Rossano's supervision.  (Def.'s 56.1 Stmt. ¶ 55; Pl.'s 56.1 Stmt. ¶ 55.)  On September 7, 2004, Ibrahim notified plaintiff that the Leave Restriction would remain in effect during his assignment with Rossano.  (Def.'s 56.1 Stmt. ¶ 56; Pl.'s 56.1 Stmt. ¶ 56.)  On September 16 and October 6, 2004, plaintiff arrived to work late, and was placed on AWOL.  (Def.'s 56.1 Stmt. ¶¶ 57–58; Pl.'s 56.1 Stmt. ¶¶ 57–58.)  On October 6, 2004, plaintiff sent another follow-up email to Betancur, requesting that Betancur contact him about EEO counseling.  (Def.'s 56.1 Stmt. ¶ 49; Pl.'s 56.1 Stmt. ¶ 49.)  Betancur replied to the October 6 message in an email that contained nineteen attachments and read: "Here are the email documents you requested."  (Def.'s 56.1 Stmt. ¶ 50; Pl.'s 56.1 Stmt. ¶ 50.)  All of these documents related to plaintiff's *first* EEO complaint.  (Def.'s 56.1 Stmt. ¶ 51; Pl.'s 56.1 Stmt. ¶ 51.)  Plaintiff sought these documents because they were necessary for Simmons to handle the second request for EEO counseling regarding the Leave Restriction.  (Def.'s 56.1 Stmt. ¶ 52; Pl.'s 56.1 Stmt. ¶ 52.)

On October 26 and 28, 2004, Rossano denied plaintiff's requests for emergency annual leave.  (Def.'s 56.1 Stmt. ¶¶ 59–60; Pl.'s 56.1 Stmt. ¶¶ 59–60.)  Plaintiff arrived to work thirty minutes late on both occasions and was placed on AWOL.  (*Id.*)

After plaintiff complained that the restriction placed on his annual leave violated his union contract, on October 28, 2004, Deputy District Manager Washington contacted FSIS's Employee Relations Branch ("ERB") to investigate the issue. (Def.'s 56.1 Stmt. ¶ 42; Riley Decl., Ex. 19; Pl.'s 56.1 Stmt. ¶ 42.) On October 29, 2004, William Kent, an ERB employee, informed Washington that, under the union contract, leave restrictions may be imposed on unscheduled annual leave. (Def.'s 56.1 Stmt. ¶ 44; Riley Decl., Ex. 19; Pl.'s 56.1 Stmt. ¶ 44.) That same day Washington replied that he remained unable to find a legal basis for the placing the leave restriction on annual leave. (Riley Decl., Ex. 19.)

On November 10, 2004, plaintiff arrived to work one and a half hours late, causing him to be charged with AWOL again. (Def.'s 56.1 Stmt. ¶ 62; Pl.'s 56.1 Stmt. ¶ 62.) On November 2 and 10, 2004, Rossano gave plaintiff written counseling memorandums, cautioning him that further incidents could lead to disciplinary action. (Def.'s 56.1 Stmt. ¶¶ 61, 63–64; Pl.'s 56.1 Stmt. ¶¶ 61, 63–64.)

On November 11, 2004, Rossano submitted to Deputy District Manager Washington a recommendation for further disciplinary action against plaintiff. (Def.'s 56.1 Stmt. ¶ 68; Pl.'s 56.1 Stmt. ¶ 68.) The decision as to whether disciplinary action is warranted and the nature of any such action are at the discretion of the Deciding Official in the ERB. (Def.'s 56.1 Stmt. ¶ 71; Pl.'s 56.1 Stmt. ¶ 71.) Accordingly, Washington referred the matter to the ERB for disposition pursuant to the FSIS policy. (Def.'s 56.1 Stmt. ¶ 72; Pl.'s 56.1 Stmt. ¶ 72.)

On December 2 and 27, 2004, plaintiff failed to report to work on time and was charged AWOL for fifteen and thirty minutes, respectively. (Def.'s 56.1 Stmt. ¶ 66; Pl.'s 56.1 Stmt. ¶ 66.) On December 29, 2004, plaintiff was scheduled to begin work at 5:00 a.m. (Def.'s 56.1

Stmt. ¶ 67; Pl.'s 56.1 Stmt. ¶ 67.)  He paged Rossano at 4:50 a.m. to report that he would be late. (*Id.*)  Plaintiff arrived at 5:30 a.m., and Rossano charged him with thirty minutes AWOL.  (*Id.*)

On January 11, 2005, Employee Relations Specialist Sandra Bain (an ERB official), issued a letter to plaintiff notifying him that she proposed to suspend him without pay for five days for his unauthorized absences and failure to comply with the Leave Restriction Notice. (Def.'s 56.1 Stmt. ¶ 73; Pl.'s 56.1 Stmt. ¶ 73.)  In order to respond to the proposed suspension, Laudadio requested a meeting with an Oral Conference Officer ("OCO").  (Def.'s 56.1 Stmt. ¶ 76; Pl.'s 56.1 Stmt. ¶ 76.)  On February 15, 2005, OCO Luz Cantres conducted a conference with plaintiff.  (Def.'s 56.1 Stmt. ¶ 77; Pl.'s 56.1 Stmt. ¶ 77.)  On February 25, 2005, Chief of the ERB Kristie D. Kelm issued a Decision Letter, reducing the proposed suspension to one day. (Def.'s 56.1 Stmt. ¶ 80; Pl.'s 56.1 Stmt. ¶ 80.)  The Decision Letter expressly advised plaintiff of his right to file a grievance within ten days of receipt of the letter or a discrimination complaint within forty-five days of the letter's effective date.  (Def.'s 56.1 Stmt. ¶ 83; Pl.'s 56.1 Stmt. ¶ 83.)  Plaintiff did neither.  (Def.'s 56.1 Stmt. ¶ 84; Pl.'s 56.1 Stmt. ¶ 84.)  Plaintiff claims he failed to contact an EEO counselor within forty-five days because he was led to believe that the Leave Restriction and all forms of discipline arising therefrom could be addressed when the Leave Restriction was lifted.  (Pl.'s 56.1 Stmt. ¶ 84.)

Plaintiff's Leave Restriction was lifted on July 6, 2005.  (Frank Decl., Ex. M.)  On July 21, 2005, Laudadio contacted EEO Counselor Art Simmons and initiated informal EEO counseling, alleging retaliation for his initial EEO complaint.  (Def.'s 56.1 Stmt. ¶ 85; Pl.'s 56.1 Stmt. ¶ 85.)  On October 12, 2005, plaintiff filed his second formal EEO complaint.  (Def.'s 56.1 Stmt. ¶ 86; Pl.'s 56.1 Stmt. ¶ 86.)  "On January 20, 2006, the [USDA] accepted and referred for

investigation the claim[s] that [p]laintiff was subjected to harassment [as a reprisal for his prior EEO activity] when: (1) he was placed under sick leave restriction and was charged AWOL on four occasions, (2) one of his supervisors destroyed leave slips to justify AWOL charges; (3) he was given a proposed five-day suspension that was reduced to a one-day suspension; and (4) one of his supervisors threatened to shoot plaintiff if he had a gun." (Def.'s 56.1 Stmt. ¶ 87; Pl.'s 56.1 Stmt. ¶ 87.)

On November 22, 2006, the USDA issued a FAD dismissing plaintiff's second EEO complaint as untimely filed pursuant to 29 C.F.R. § 1614.107(a) and 1614.105(a) (1), requiring a complainant contact an EEO counselor within forty-five days of the alleged discriminatory actions. (Def.'s 56.1 Stmt. ¶ 88; Pl.'s 56.1 Stmt. ¶ 88.) *See also* 29 C.F.R. §§ 1614.105(a) (1), 1614.107(a). The FAD also stated that "[e]ven assuming [timeliness of the contact], the weight of the evidence indicates that discrimination did not occur." (Riley Decl., Ex. 39, at 18.) Plaintiff initiated the instant action on February 23, 2007. (Dkt No. 1.) On August 21, 2007 the USDA issued another FAD (discussed above) dismissing the first and the second EEO complaints pursuant to 29 C.F.R. § 1614.107(a) (3) as complaints that are "the basis for a pending civil action in a United States District Court." (Frank Decl., Ex. E.)

## DISCUSSION

Summary judgment may be a useful "tool for clearing the calendar of doomed lawsuits." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 40 (2d Cir. 2000). Generally, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to [Title VII] cases than to . . . other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d. Cir. 1985). But summary judgment is also a "drastic procedural weapon because its prophylactic

function, when exercised, cuts off a party's right to present his case to the jury." *Garza v. Marine Transp. Lines*, 861 F.2d 23, 26 (2d Cir. 1988) (internal quotation marks omitted). Determination as to employer's motive in Title VII cases requires an assessment of "individuals' motivations and state of mind, matters that call for a sparing use of the summary judgment device because of juries' special advantages over judges in this area." *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001). Thus, in Title VII cases, district courts must be "especially chary in handing out summary judgment . . . because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 87 (2d Cir. 1996).

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court should not weigh the evidence, but determine whether there exists a genuine issue of fact for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). An issue of fact exists where "the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). At this stage, the court has to resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *Anderson,* 477 U.S. at 255; *Pinto v. Allstate Ins.*, 221 F.3d 394, 398 (2d Cir. 2000) (citation omitted).

Here, the defendant, as the moving party, is initially responsible for demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *See Goenaga v. March of Dimes*

*Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citation omitted).  If, however, plaintiff, as

the opposing party, fails to make a showing of an essential element of its case for which it bears

the burden of proof, summary judgment will be granted.  *See Celotex*, 477 U.S. at 323.  To

overcome the motion for summary judgment, Laudadio cannot rely on conclusory allegations or

unsubstantiated speculation and must set forth in sworn affidavits or other documentary evidence

specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)*; Jeffreys v.*

*City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005); *Goenaga,* 51 F.3d at 18.

### I.  <u>Summary Judgment is Denied on the Claims in Laudadio's First EEO Complaint</u>

The government argues that it is entitled to summary judgment on the claims raised in

Laudadio's first EEO complaint because (1) Laudadio failed to fully exhaust his administrative

remedies, and (2) even if he did, Laudadio failed to file his complaint in federal court in a timely

manner pursuant to 42 U.S.C. § 2000e-16(c).  (Memorandum of Law in Support of Defendant's

Motion for Summary Judgment ("Def.'s Mem.") at 4–8.)  Both of these arguments fail.

### A.  <u>Laudadio Exhausted the Administrative Remedies on His First EEO Complaint</u>

As a precondition to filing a Title VII claim in federal court, a plaintiff must exhaust his

administrative remedies.  *Fernandez v. Chertoff*, 471 F.3d 45, 54 (2d Cir. 2006).  An aggrieved

employee is first required to attempt to resolve the matter informally by contacting a counselor at

the agency's EEO within forty-five days of the alleged discriminatory act.  29 C.F.R. §

1614.105(a).  If the matter is not resolved after the mandatory counseling period, the employee

must file a formal written administrative complaint ("EEO complaint") with his agency.  29

C.F.R. § 1614.106(a).  After the complaint is filed, the agency must conduct and complete an

investigation of the allegations within 180 days.  29 C.F.R. §§ 1614.106(e) (2), 1614.108(e).

When the investigation is complete, or no later than 180 days after the EEO complaint is filed, the employee may choose either (1) to have the agency issue a FAD or (2) to have a hearing before an EEOC ALJ. 29 C.F.R. § 1614.108(f). Once the agency issues a FAD, the employee may appeal to the EEOC. 29 C.F.R. § 1614.401.

Notwithstanding these administrative remedies, Section 717(c) of Title VII authorizes an employee to file a civil action in federal court 180 days from the date of filing a written EEO complaint with the agency or an appeal with the EEOC, regardless of whether the agency took final action on the complaint.[5] 42 U.S.C. § 2000e-16(c); *see also* 29 C.F.R. § 1614.407 ("A complainant who has filed an individual complaint . . . is authorized under [T]itle VII . . . to file a civil action in an appropriate United States District Court: . . . (b) After 180 days from the date of filing [a] complaint if an appeal has not been filed and final action has not been taken").

Laudadio filed his first EEO complaint with the USDA on January 30, 2004. (Def.'s 56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶ 24.) Pursuant to the plain meaning of Section 717(c), because the USDA had not taken final action on the complaint within 180 days of filing, Laudadio was entitled to bring suit in federal court on July 27, 2004 (180 days after January 30, 2004). *See Wrenn v. Dep't. of Veterans Affairs*, 918 F.2d 1073, 1077 (2d Cir. 1990) ("The claimant is . . . authorized to file a civil action . . . if, after 180 days from the date of filing a complaint with the

---

[5] Section 717(c) of Title VII provides:
> [A]fter one hundred and eighty days from the filing of the initial charge with the *department, agency, or unit or with the [EEOC] on appeal* from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, *an employee . . . , if aggrieved* by the final disposition of his complaint, or *by the failure to take final action on his complaint, may file a civil action . . .* , in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

42 U.S.C. § 2000e-16(c) (emphasis added).

agency . . ., there has been no administrative decision."); *Munoz v. Aldridge*, 894 F.2d, 1489, 1492–93 (5th Cir. 1990) ("Essentially, the 180-day provision allows the claimant to appeal to the district court if there has not been final agency action on his claim after six months from filing the claim with the agency.") (citation and internal quotation marks omitted).[6]  At that time, however, Laudadio chose not exercise his right to bring a civil action, and instead requested a hearing before an EEOC ALJ on August 15, 2004 (more than 180 days after filing).  (Def.'s 56.1 Stmt. ¶ 26; Pl.'s 56.1 Stmt. ¶ 26.)  After the EEOC held certain proceedings, on December 15, 2004, Laudadio withdrew his request for a hearing because he had decided to pursue his rights in federal court.  (Def.'s 56.1 Stmt. ¶ 29; Pl.'s 56.1 Stmt. ¶ 29.)

The government does not dispute that Laudadio's right to sue accrued on July 27, 2004. Instead, relying principally on *Wiley v. Johnson*, 436 F. Supp. 2d 91 (D.D.C. 2006), the government argues that notwithstanding the passage of 180 days, Laudadio failed to exhaust the available administrative remedies fully because he filed, but then withdrew a request for an EEOC hearing.  (Def.'s Mem. at 5–6.)  According to the government, Laudadio's withdrawal "prevented the EEOC from investigating his claim on the merits" and constituted a failure to diligently participate in the administrative process.  (*Id.* at 6.)  Consequently, the government contends that Laudadio is now precluded from relying on any of the allegations that formed the basis of his first EEO complaint.  (*Id.*)

In *Wiley*, an Environmental Protection Agency ("EPA") employee filed suit alleging discrimination and retaliation in violation of Title VII.  *Wiley*, 436 F. Supp. 2d at 93.  Prior to

_____

[6]  Laudadio's request for a hearing with the EEOC is not an "appeal" to the EEOC from a final agency decision.  *Compare* 29 C.F.R. § 1614.109 ("Hearings") *with* 29 C.F.R. § 1614.401 ("Appeals to the Commission").

commencement of the suit, Wiley's participation in the EPA's administrative process closely resembled Laudadio's involvement in the USDA's process. *See id.* at 93–94. On April 26, 2001, Wiley filed his discrimination claim with the EPA (and later amended to include a claim of retaliation). *Id.* at 93. After the EPA formally investigated the claim, on February 21, 2002, Wiley requested a hearing before the EEOC. *Id.* On January 7, 2003, prior to the hearing, but more than 180 days after Wiley filed his EEO complaint, Wiley requested that the EEOC dismiss his case so he could proceed in federal court. *Id.* at 94. The EEOC granted the request and returned the claim to the EPA for further processing pursuant to 29 C.F.R. § 1614.109(i), which provides that "[i]f an agency does not issue a final order within [forty] days of receipt of the [ALJ]'s decision . . . then the decision of the [ALJ] shall become the final action of the agency." *Id.*; 29 C.F.R. § 1614.109(i). The EPA did not further address the claim, and on October 16, 2003, Wiley sued in federal court. *Id.*

Although the parties in *Wiley* did not brief the exhaustion issue and focused on other statutory grounds for dismissal,[7] the court held that Wiley failed to exhaust his administrative remedies because he voluntarily withdrew his request for an EEOC hearing. *Id.* According to the *Wiley* decision, the withdrawal frustrated the purposes behind exhaustion, such as "to give the

---

[7] The court in *Wiley* recognized that, arguably, Wiley exhausted his administrative remedies because "the EPA still had the opportunity to handle Mr. Wiley's Administrative Claim internally—after the EEOC's dismissal, the case was returned to the agency for further processing pursuant to 29 C.F.R. § 1614.109." *Wiley*, 436 F. Supp. 2d at 95 n.2. Similarly, after Laudadio withdrew his request for an EEOC hearing in December 2004, the ALJ dismissed the EEOC complaint and returned the claim to the USDA for further action. (Def.'s 56.1 Stmt. ¶ 30; Pl.'s 56.1 Stmt. ¶ 30.) The USDA did not issue its FAD until more than two years later, and not until nearly six months *after* the commencement of this action. (Frank Decl., Ex. E.) During the intervening period, the USDA "still had the opportunity to handle" Laudadio's first EEO complaint, but chose not to. *See Wiley*, 436 F. Supp. 2d at 95 n.2.

charged party notice of the claim, to narrow the issues for prompt adjudication, to afford the agency an opportunity to resolve the matter internally, and to avoid unnecessarily burdening the courts." *Id.* (citations and internal quotation marks omitted).

The government's argument and the reasoning in *Wiley* are unpersuasive because Wiley's voluntary withdrawal of his request for an EEOC hearing more than 180 days after filing the complaint with the EPA did not frustrate the purposes of the exhaustion doctrine. Wiley filed his discrimination claim with the EPA on April 26, 2001. *Id.* As such, Wiley gave notice of the claim to the charged party and afforded the agency an opportunity to resolve the matter internally. Under Section 717(c), agency had 180 days to investigate the claim and narrow the issues for prompt adjudication. *See* 42 U.S.C. § 2000e-16(c). The EPA did not complete its investigation until February 21, 2002, and the EEOC hearing did not occur until January 7, 2003 (when Wiley sought the claim's dismissal). Due to EPA's failure to take final action on his complaint within 180 days of filing, under the plain language of the statute, Wiley could bring a civil action on October 23, 2001. *See* 42 U.S.C. § 2000e-16(c).

Where a complainant cooperates with the agency and the administrative process does not resolve the claim timely, he is entitled to a day in federal court. *See Brown v. Gen. Serv. Admin.*, 425 U.S. 820, 832 (1976) (under Section 717(c), "complainant may file a civil action if, after 180 days from the filing of the charge or the appeal, the agency or Civil Service Commission [the EEOC's predecessor] has not taken final action"); *Martinez v. Dep't of the Army*, 317 F.3d 511 (5th Cir. 2003) (holding that where plaintiff's withdrawal of his request for an EEOC hearing was "not un-cooperative" and the agency failed to take final action within 180 days, plaintiff could sue in federal court); *Wilson v. Peña*, 79 F.3d 154, 166 (D.C. Cir. 1996) ("Once a

complainant files a complaint or appeal and cooperates with the agency or EEOC for 180 days, he is not required to take any further action to exhaust his administrative remedies."); *Munoz*, 894 F.2d at 1493 (holding that where "[t]he administrative record discloses no evidence that the plaintiffs failed to cooperate or otherwise attempted to frustrate the administrative process," they exhausted their administrative remedies); *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) ("At the end of the 180 day period the employee is entitled to sue, regardless of the pendency of EEOC proceedings"); *Brown v. Tomlinson*, 462 F. Supp. 2d 16, 19–20 (D.D.C. 2006) (finding that an employee who withdrew request for an EEOC hearing with 180 days after filing the complaint exhausted his administrative remedies); 3 Lex K. Larson, Employment Discrimination § 64.02 (2d ed. 2000) ("if 180 days pass without final agency action, there is no further exhaustion required").

In the Second Circuit, a claimant who wishes to bring a civil action has to show that he has participated in the administrative process in good faith. *Wrenn,* 918 F.2d at 1078. "The purpose of the good faith participation requirement is to give the administrative process an opportunity to work and to enhance the chances of administrative resolution." *Id.*; *see also Munoz*, 894 F.2d at 1493 ("Good faith effort by the employee to cooperate with the agency and EEOC and to provide all relevant, available information is all that exhaustion requires.") (citation omitted). "A claimant thus must cooperate in the administrative investigation of the complaint by making specific charges and by providing information necessary to the investigation." *Wrenn*, 918 F.2d at 1078 (citations omitted).

Before filing his civil suit in federal court, Laudadio waited the requisite 180 days without a final action from the USDA. More than three years passed between the filing of

Laudadio's first EEO complaint and the filing of his federal complaint. "Where, as here, a case languishes in the administrative phase for long beyond 180 days . . . we cannot say that abandoning the administrative process constitutes such a lack of cooperation as to bar suit by reason of failure to exhaust administrative remedies." *Munoz*, 894 F.2d at 1493.

The record does not show that Laudadio was uncooperative or attempted to frustrate the proceedings before the USDA or the EEOC. While Laudadio failed to appear at a deposition in connection with the EEOC hearing, the government does not argue that this constitutes failure to cooperate in good faith. (*See* Def.'s Mem. at 4–6; *see also* Def.'s 56.1 Stmt. ¶ 28; Pl.'s 56.1 Stmt. ¶ 28.) In any event, case law does not suggest that good faith participation must extend past 180 days. Here, Laudadio filed his EEO complaint on January 30, 2004. (Def.'s 56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶ 24.) He requested the EEOC hearing on August 15, 2004 and failed to appear at the deposition on October 20, 2004. (*See* Def.'s 56.1 Stmt. ¶¶ 26, 28; Pl.'s 56.1 Stmt. ¶¶ 26, 28.) Both of these events occurred more than 180 days after he had filed his EEO complaint. Thus, Laudadio's request for an EEOC hearing, subsequent withdrawal, and well as failure to appear at the deposition did not affect the agency's process in the first 180 days of filing of the EEO complaint.

The government's reliance on *Wrenn*, *Barber*, and *Littlejohn* is misplaced. *See* Def.'s Mem. at 5 (citing *Wrenn*, 918 F.2d 1073, *Baber v. Runyon*, No. 97-CV-4798, 1998 WL 912065 (S.D.N.Y. Dec. 30, 1998), *Littlejohn v. Henderson*, No. 01-CV-2772, 2003 WL 21738608 (E.D.N.Y June 19, 2003)). In *Wrenn*, the court held that the plaintiff did not exhaust administrative remedies and could not sue in federal court because he had refused the agency's offer of full relief. *Wrenn*, 918 F.2d at 1074. The USDA did not offer Laudadio full relief, and

the policy favoring the administrative resolution of complaints emphasized in *Wrenn* is not implicated here. *See id.* In *Barber*, the court found that the plaintiff did not exhaust her administrative remedies because she withdrew her EEO complaint prior to expiration of the 180-day statutory period. *Baber*, 1998 WL 912065, at *2–3, 5. In contrast, Laudadio withdrew his complaint long after the period expired. In *Littlejohn*, plaintiff's claims were time-barred for failure to contact an EEO counselor within the forty-five-day period, a requirement with which Laudadio complied. *See Littlejohn*, 2003 WL 21738608, at *1, 3. Littlejohn attempted to argue "half-heartedly" that prior to the expiration of the statutory period, she allegedly filed an EEO complaint, "but then was forced to withdraw it." *Id.* at *3. The evidence, however, established that she did not file a complaint at that time. *Id.* The court, however, observed in dicta that even in such case, "the withdrawal of an EEO complaint must be considered as a waiver of any underlying discrimination claims." *Id.* Taken out of context, this dicta fails to address the issue of withdrawal after the 180-day period and does not establish whether Laudadio waived his claim.

In sum, under 42 U.S.C. § 2000e-16(c), Laudadio participated in good faith in the administrative process, and his withdrawal after the expiration of the 180-day statutory period did not bar his claim in federal court. Since Laudadio exhausted his administrative remedies with respect to his first EEO complaint, summary judgment on this issue is denied.

### B. Laudadio's Federal Action Is Timely under 42 U.S.C. § 2000e-16(c)

The government contends that Laudadio failed to bring this action timely pursuant to Section 717(c) of Title VII, (Def's Mem. at 6–8), which bars a plaintiff from brining a civil action beyond ninety days of "receipt of notice of *final action* taken by" the agency or the EEOC.

42 U.S.C. § 2000e-169(c) (emphasis added). The statute does not define "final action," but 29

C.F.R. § 1614.109(i) provides that if the agency "does not issue a final order within [forty] days

of receipt of the [ALJ]'s decision . . . , then the decision of the [ALJ] shall become the *final

action* of the agency." *See* 29 C.F.R. § 1614.109(i). Here, on December 17, 2004, the ALJ

issued the Order Dismissing EEOC Action with Prejudice (the "ALJ Order"), which dismissed

Laudadio's request for an EEOC hearing based on complainant's withdrawal of his charge, and

returned the matter to the USDA's jurisdiction for a FAD and other processing required under 29

C.F.R. § 1614.110 ("Final Action by Agencies"). (Frank Decl., Ex. H; Riley Decl., Ex. 16.) *See

also* 29 C.F.R. § 1614.110. The government argues that forty days later, on January 27, 2005, the

ALJ Order became the "the final action of the agency" pursuant to 29 C.F.R. § 1614.109(i), and

Laudadio had until April 27, 2005 to bring a civil action pursuant to Section 717(c) (that is ninety

days after January 27, 2005). (Def's Mem. at 7–8.) Laudadio commenced this action after that

date, on February 23, 2007. (*Id.*; Dkt No. 1.) Contrary to the government's argument, however,

Laudadio's action is timely because the ALJ Order did not become the "final action" of the

agency.

Generally, when an ALJ issues a decision, the agency must issue a "final order"

"implementing" the ALJ's decision within forty days. 29 C.F.R. § 1614.110(a) (requiring the

agency to issue a final order, which "notif[ies] the complainant[s] whether or not the agency *will

fully implement the decision* of the [ALJ]" ) (emphasis added); *Moncus v. Johanns*, No. 2:03-CV-

416 (W), 2006 WL 163309, at *8 (M.D. Ala. Jan. 20, 2006) ("Section 1614.110 states the

agency's obligation to issue a final decision in mandatory terms"). If the agency fails to issue a

final order within that time period, the ALJ decision becomes the "final action of the agency" by

operation of law.  29 C.F.R. § 1614.109(i).  The rationale for this regulatory scheme is that it "is meant to bind the agency to the [ALJ's] decision unless it objects within [forty] days."  *Moncus,* 2006 WL 163309, at *8 (discussing the purpose of 29 C.F.R. § 1614.109(i)).

Implicit in 29 C.F.R. § 1614.110(a)'s phrase "implement the decision," is that the ALJ necessarily decided a claim on the merits, whether substantively or procedurally, rather than simply issued an interlocutory order and remanded the case for further substantive processing, as in this case.  In other words, the ALJ's decision must have imposed an obligation, denied a right, or fixed some legal relationship between the parties.  Otherwise, there would be nothing in the decision for the agency to "implement."  Likewise, 29 C.F.R. § 1614.110(b), which applies to final actions "in all other circumstances," requires agencies to issue final decisions which "consist of findings by the agency *on the merits of each issue in the complaint, or, as appropriate, the rationale for dismissing any claims in the complaint* and, when discrimination is found, appropriate remedies and relief . . .."  *Id.* (emphasis added).  Similar to subsection (a), this language necessarily implies that a final agency action must mark the end of the agency's decisionmaking process and ascertain with finality the parties' respective rights and obligations, yielding a determination from which legal consequences will flow.

The ALJ's dismissal of a claim upon the complainant's request, however, is not a decision on the merits and may not become the "final" agency decision by operation of law.  *See Gagnon v. Potter,* No. 3:05-CV-324 (RM), 2006 WL 2051730, at *4 (N.D. Ind. July 19, 2006) ("[t]o interpret a dismissal not based upon the merits as triggering a final agency decision . . . would contravene the purpose of requiring exhaustion").  Where a complainant withdraws his request for an EEOC hearing, he "effectively requests an 'immediate final decision' requiring *the*

*[a]gency* to issue a final decision *with findings on the merits* of each issue in the complaint"
*Hunter v. Keisler*, No. 06-CV-5908 (RBK), 2007 WL 3171223, at *4 (D.N.J. Oct. 26, 2007)
(emphasis added).

A"final" agency decision must mark the end of the agency's decisionmaking process and
determine the parties' respective rights and obligations.  Construing the term "final agency
action" in  5 U.S.C. § 704 (in determining the status of the Fish and Wildlife Service opinions),
the Supreme Court explained that a "final agency action" should be a "consummation of the
agency's decisionmaking process" "from which legal consequences will flow." *Bennett v. Spear*,
520 U.S. 154, 178 (1997); *see also Franklin v. Mass.*, 505 U.S. 788, 797 (1992) ("[t]he core
question is whether the agency has completed its decisionmaking process, and whether the result
of that process is one that will directly affect the parties"); *New York  v. EPA,* 350 F. Supp. 2d
429, 434–37 (S.D.N.Y. 2004) (applying the *Bennett* finality requirements).

Similarly, in interpreting the finality requirement in the context of 18 U.S.C. § 925(c)
(allowing an applicant for relief from firearms disabilities to seek judicial review of a "final
action" by the Secretary of the Treasury), the Supreme Court endorsed analogous reasoning
holding that "an actual decision by [the agency] on an application is a prerequisite for judicial
review" and "mere inaction by [the agency] does not invest a district court with independent
jurisdiction to act on an application." *United States v. Bean*, 537 U.S. 71, 75–76 (2002).  While
29 C.F.R. § 1614.109(i) provides that the agency's inaction results in the ALJ decision becoming
the "final action of the agency," this requires that the ALJ decision, too, complies with the
finality principles.  As Title VII and its regulatory scheme seek to facilitate the prompt resolution
of discrimination complaint at the agency level and to avoid piecemeal litigation in federal court,

a rule requiring a "final" agency action to mark the end of the agency's decisionmaking process

and determine the parties' respective rights and obligations makes sense practically, and

comports with the principles of administrative law generally, and Title VII in particular.[8]

Here, the ALJ Order denied the USDA's motion for summary judgment and returned the

case to the USDA's jurisdiction for a final decision on the merits:

> [A]lthough I would grant the Agency's motion for summary judgment under other
> circumstances, I will deny it in this instance.  Instead, I dismiss [Laudadio's]
> request for an EEOC hearing with prejudice.  *This matter is to be returned to the
> [USDA]'s jurisdiction for a Final Agency Decision on the merits and for such
> other processing as required by 29 C.F.R. § 1614.110 ["Final Action by
> Agencies"]*.

(Frank Decl., Ex. H at 2 (emphasis added).)  This order neither made findings with respect to

discrimination, or the lack thereof, nor granted or denied any substantive relief.

The ALJ Order could not become the USDA's final action because it expressly required

further substantive action by the USDA with respect to the merits of the case.  One cannot "view

[an order] which obviously contemplates remand and further agency action as 'final' within the

meaning of the statute." *Dees v. Orr*, No. S-82-471 (LKK), 1984 WL 964, *4–5 (E.D. Cal. Feb.

2, 1984) (finding that a "final action" within the meaning of Section 717(c) has to resolve all

disputed issues on the merits, and not be interim in nature).  As the ALJ Order directed the

---

[8]  The ALJ Order also could not become a "final action" by the agency because the order
did not advise the complainant of his rights.  *Cf. Zamora v. Dep't of Homeland Sec.*, No.
S-07-CV-023 (RRB) (EFB), 2008 WL 215188 (E.D. Cal. Jan. 24, 2008) (finding that the ALJ
order dismissing the claim at complainant's request became the "final" agency action where the
order "specifically informed" the complainant of her rights to request reinstatement of the case
with the EEOC and bring a civil action).  This is consistent with the requirement that all other
final agency actions (as distinguished from ALJ orders that have become the final agency action
by operation of law) must provide notice to the complainant of his rights, *inter alia*, to appeal to
the EEOC and file a civil action in federal court.  *See* 29 C.F.R. § 1614.110 (setting forth notice
requirements for a "final action by an agency in all other circumstances").

USDA to make a decision on the merits, this order did not provide any "decision" for the agency to "implement" pursuant to Section 1614.110(a). *See* 29 C.F.R. § 1614.110(a). In the absence of the ALJ's final decision, the USDA would need to continue to process Laudadio's first EEO complaint and render a "final" agency action pursuant to Section 1614.110(b)—a decision "on the merits of each issue in the complaint, or, as appropriate, the rationale for dismissing any claims in the complaint and, [if] appropriate [provide] remedies and relief." *Id.* § 1614.110(b).

Notably, six months after Laudadio commenced this action, on August 21, 2007, the USDA issued a FAD with respect to his first complaint. (Frank Decl., Ex. E.) In its FAD, the USDA dismissed the claim pursuant to Section 1614.107(a) (3) on the ground that the EEO complaint was the basis of a pending civil action in federal court. (*Id.*) This undermines the defendant's argument that the ALJ Order had become the "final action by the agency" by operation of Section 1614.109(i).

In any case, where, as here, an ALJ issues a decision that does not resolve any of the disputed issues and does not impose an obligation, deny a right, or fix some legal relationship between the parties, and expressly contemplates further substantive action, that "decision" cannot automatically become "the final action of the agency" pursuant to 29 C.F.R. § 1614.109(i) and thus, does not set the point at which the ninety-day limitation of Section 717(c) of Title VII begins to accrue.[9]

_____

[9] Even if the ALJ Order became the "final" agency action forty days later, the ninety-day limit for brining a civil action should be equitably tolled. The ninety-day requirement is not a jurisdictional prerequisite, but a limitation period subject to equitable tolling. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94–96 (1990). Equitable tolling "permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity." *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 223 (2d Cir. 2002) (citation and internal quotation marks omitted). Application of this doctrine is "only appropriate in rare and exceptional circumstances,"

As Laudadio has exhausted administrative remedies with respect to his first EEO complaint and timely brought this action, defendant's motion for summary judgment on these issues is denied.

**II.  Laudadio Exhausted the Administrative Remedies on His Second EEO Complaint**

The government argues that the majority of claims in Laudadio's second EEO complaint are barred because Laudadio failed to contact an EEO counselor timely, and thus, properly exhaust his administrative remedies under 29 C.F.R. § 1614.105(a) (1).  (Def's Mem. at 8–14.) This regulation requires that "[a]n aggrieved person must initiate contact with [an EEO counselor] within [forty-five] days of the date of the matter alleged to be discriminatory."  29 C.F.R. § 1614.105(a) (1).  The government's argument is unpersuasive.

Before a federal employee can bring a civil action under Title VII in federal court, he must first exhaust his administrative remedies by following the procedures set forth in the EEOC regulations.  *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. part 1613; *Terry v. Ashcroft*, 336 F.3d 128, 150 (2d Cir. 2003) (treating the requirement that a federal employee contact his EEO counselor as analogous to the requirement that a private sector employee first bring the complaint to the

---

*Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir. 2001) (citation and internal quotation marks omitted), in which a party is prevented in some extraordinary way from exercising his rights, *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (citation and internal quotation marks omitted).  Here, it is undisputed that Laudadio several times requested a final agency action so he could bring a federal civil action, but, until he commenced this action, the USDA did not issue its FAD with respect to Laudadio's first complaint.  (*See* Riley Decl., Ex. 15; Frank Decl., Ex. E.) The December 17, 2004 ALJ Order returned the case to the USDA for a "Final Agency Decision" and failed to notify Laudadio that this order would become the final agency action in the absence of the USDA's further action within forty days.  In contrast, the FAD the USDA issued on August 21, 2007 explicitly informed Laudadio that he had thirty days to appeal to the EEOC and ninety days to bring a civil action.  (Frank Decl., Ex. E at 4, 5.)  As such, the USDA is equitably precluded from asserting that the ninety-day limitation began accruing on January 27, 2005.

EEOC's attention) (citation omitted). If the employee fails to do so, the government can raise the failure to exhaust administrative remedies as an affirmative defense, which would procedurally bar the plaintiff's claims. *Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001). This serves the basic purpose of the exhaustion doctrine, which "is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37 (1972) (citation omitted) (generally discussing exhaustion as an administrative law doctrine).

The exhaustion requirement, however, does not apply to claims that are "reasonably related" to those already asserted in a prior timely EEO charge. *Anderson v. Dep't of Children & Families of Conn.,* 322 Fed. Appx. 15, 16 (2d Cir. 2009) (finding that it was an error to dismiss a retaliation claim—a "reasonably related" claim—as unexhausted); *Mathirampuzha v. Potter,* 548 F.3d 70, 75 (2d Cir. 2008). The "reasonably related" doctrine applies when "the factual allegations made in the administrative complaint can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised." *Mathirampuzha,* 548 F.3d at 77. This doctrine is "essentially an allowance of loose pleading," which recognizes that employees frequently assert their Title VII claims without counsel's assistance and the primary purpose of the initial complaint is to provide notice to the agency. *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003).

The Second Circuit courts have identified three situations where claims are so "related to the allegations in the [prior] charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action." *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402–03 (2d Cir. 1993), *superceded by statute on other grounds*, Civil Rights Act of 1991, Pub.

L. No. 102-166, § 101, 105 Stat. 1071, 1071–72. These situations involve claims that: (1) fall "within the scope of what might be reasonably expected to come out in the EEO investigation prompted by" the initial charge, (2) allege retaliation for filing an EEO complaint, or (3) allege additional violations "carried out in an identical manner to those alleged in the EEO charge." *Walia v. Chertoff*, No. 06-CV-6587 (JBW), 2008 WL 5246014, *7 (E.D.N.Y. Dec. 17, 2008) (citing *Terry,* 336 F.3d at 151). In the analysis of "reasonably related" claims "it is the substance of the charge and not its label that controls." *Deravin*, 335 F.3d at 201. Ultimately, this inquiry focuses on whether the "the factual underpinnings" of the subsequent claim were presented in the prior charge and whether the initial charge gave the agency adequate notice to investigate the case on bases contained in both the initial complaint and the subsequent civil action. *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 70–71 (2d Cir. 2006) (per curiam).

Here, with respect to the July 22, 2004 Leave Restriction, the government concedes that there exists a genuine issue of material fact as to whether Laudadio contacted an EEO counselor timely (Def's Mem. at 9.) Ibrahim placed Laudadio on Leave Restriction on July 22, 2004, and on July 23, 2004, the next day, Laudadio e-mailed his prior EEO counselor and, according to Laudadio, called the counselor's supervisor, the head of the EEO, regarding the Leave Restriction. (Riley Decl., Ex. 2 at 156–161, 17; Def.'s 56.1 Stmt. ¶ 45, 46; Pl.'s 56.1 Stmt. ¶ 45, 46–47.) Laudadio e-mailed the EEO counselor again on August 25, 2004 and on October 6, 2004. (Def.'s 56.1 Stmt. ¶ 48, 49; Pl.'s 56.1 Stmt. ¶ 48, 49.) The EEO counselor responded to Laudadio only on October 6, 2004 (more than forty-five days after Laudadio's July 23, 2004 e-mail) and forwarded to Laudadio certain documents related to Laudadio's prior counseling that Laudadio needed to handle his second complaint. (Riley Decl., Ex. 2 at 191,193–94, 20; Def.'s

56.1 Stmt. ¶ 50–52; Pl.'s 56.1 Stmt. ¶ 50–52.)  Given that Laudadio has shown that he contacted both the EEO counselor and his supervisor prior to the expiration of the forty-five day period, and the counselor responded only months later, summary judgment on this issue is not warranted.

Read fairly, Laudadio's second EEO complaint alleges a series of interrelated actions that began with him being placed on Leave Restriction on July 22, 2004 in retaliation for filing his first EEO complaint, and culminated in Leave Restriction being lifted on July 6, 2005.  Between July 2004 and July 2005, most of the alleged retaliatory actions involved leave-related issues which, while not identical, are sufficiently similar to the charges that Laudadio brought to the EEO counselor's attention in July 2004.  The non-leave-related conduct falls within the scope of what might be reasonably expected to come out in the EEO investigation prompted by Laudadio's July 23, 2004 request for EEO counseling, and constitute additional allegations of retaliation carried out in a similar manner to those Laudadio alleged in his first complaint.  After all, "a complaint of retaliation could reasonably be expected to inquire into other instances of alleged retaliation by the same actor."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 178 (2d Cir. 2005) (citation, internal quotation marks, and brackets omitted).  Title VII's administrative exhaustion requirement should not be read to require a federal employee, who has already contacted an EEO counselor about retaliation, to separately contact that EEO counselor each and every time an additional related retaliatory actions occur.

Construing the proffered evidence in the light most favorable to Laudadio, the specific incidents in his second EEO complaint beginning with and following the July 22, 2004 leave restriction are sufficiently related to warrant a trial.  Even if, *arguendo,* Laudadio had failed to contact an EEO counselor timely regarding the claims in his second EEO complaint, these claims

are "reasonably related" to his initial EEO charge, and thus, cannot be dismissed as unexhausted. Laudadio's September 12, 2003 request for EEO counseling gave the USDA notice of Laudadio's claim that his supervisors allegedly discriminated against him on the basis of race and national origin when they denied his request for an assignment exchange. Laudadio's January 30, 2004 first EEO complaint asserted a claim of retaliation for his prior EEO counseling and reiterated Laudadio's discrimination claim, referring to the following adverse employment actions: (1) denial of the assignment-exchange request, (2) subjecting Laudadio to ethnically derogatory remarks, (3) threat to reassign Laudadio to a Long Island duck farm, (4) denial of certain leave, and (5) denial performance appraisals. (Def.'s 56.1 Stmt. ¶ 25; Pl.'s 56.1 Stmt. ¶ 25.) The government is not challenging the timeliness of these initial claims, and I deem them administratively exhausted. *See Terry*, 336 F.3d at 150 (stating that the requirement of raising a claim with the EEO office is not jurisdictional and, like a statute of limitations, subject to waiver) (citing *Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982))

Laudadio's second EEO complaint alleged "reprisal" (retaliation) for his prior EEO activity based on the following employer actions: (1) the Leave Restriction (identified in the USDA's acknowledgment as a "sick leave restriction"), (2) four AWOL charges, (3) the alleged destruction of Laudadio's leave slips; (3) a proposed five-day suspension (reduced to a one-day suspension); and (4) his supervisor's threat to "shoot" Laudadio "if [the supervisor] had a gun." (Riley Decl., Ex. 37, 38; Def.'s 56.1 Stmt. ¶ 87; Pl.'s 56.1 Stmt. ¶ 87.) These allegations are not discrete and sufficiently relate to Laudadio's prior EEO charge.

Retaliation claims, such as those raised in Laudadio's second EEO complaint, are "reasonably related" to prior EEO claims because of "the close connection of the retaliatory act

to both the initial [alleged violation] and the filing of the charge itself." *Butts,* 990 F.2d at 1402; *Owens v. N.Y. City Hous. Auth.*, 934 F.2d 405, 410–11 (2d Cir. 1991) ("When an employee brings a claim alleging retaliation for filing a complaint with the EEOC, the retaliation claim is deemed 'reasonably related' to the original EEOC filing."); *Edwards v. Town of Huntington*, No. 05-CV-339, 2007 WL 2027913, *9 (E.D.N.Y. July 11, 2007) (finding that the plaintiff's "retaliation claim is not precluded by his failure to include it in his EEOC charge"). "[T]o not allow such an exception [for the exhaustion requirement] would have the perverse result of rewarding the most egregious forms of retaliation." *Terry,* 336 F.3d at 151.[10]  Therefore, Laudadio's claims in his second EEO complaint are "reasonably related"[11] to his prior complaint

---

[10]  Laudadio's claims in his second EEO complaint also arguably fall within the first and third categories of "reasonably related" claims. The claims in his second EEO complaint are "within the scope of what might be reasonably expected to come out in the EEO investigation prompted by" his first EEO complaint because an investigation of the denial of leave and the assignment-exchange request would have revealed the employer's leave and assignment allocation policies, as well as the impact of such policies on employees with prior EEO activity, implicated in Laudadio's second complaint. *See e.g., Brown v. Coach Stores*, 163 F.3d 706, 712 (2d Cir. 1998) (finding that disparate-impact claim was related to the failure-to-promote claim because the court "would expect that the [investigation] would have assessed [the employer's] promotion policies and their effect on minority employees"). The claims in Laudadio's second EEO complaint allege additional violations "carried out in an identical manner to those alleged in the EEO charge" because in both complaints Laudadio claims that his supervisors allegedly retaliated against him in the same manner—by restricting his leave use and verbally threatening him.

[11]  Accordingly, it is unnecessary to address Laudadio's arguments regarding equitable tolling and estoppel.

and thus, administratively exhausted.[12]  The motion for summary judgment on this issue is denied.

### III.  A Reasonable Jury May Find that Laudadio Established His Retaliation Claim

Title VII's anti-retaliation provision promotes the statute's "primary objective" of ensuring a workplace free from discrimination on the basis of race, ethnicity, religion or gender "[b]y preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 63 (2006).  Congress enacted the anti-retaliation provision in recognition of the fact that Title VII combats illegal employment practices "principally through reliance on employee initiative," which demands that employees' "access to statutory remedial mechanisms" remains unfettered.  *Jute,* 420 F.3d at 174–75 (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)) (internal quotation marks omitted).

In Title VII cases, a plaintiff is not required to produce direct evidence of his employer's motive, as "employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (citation and internal quotation marks omitted);

---

[12]  The government's reliance on several cases barring federal actions due to untimely EEO counselor contact is misplaced, because these cases deal with timeliness of initial *discrimination* claim, while Laudadio's second complaint alleges a claim of *retaliation* for a prior, timely filed EEO complaint.  (*See* Def's Mem. at 9 (citing *Paladino v. Potter*, No. 06-CV-5930, 2007 WL 4255247 (E.D.N.Y. Nov. 29, 2007) (granting defendant's motion for summary judgment where plaintiff failed contact an EEO counselor within forty-five days of the alleged discriminatory action); *Columbo v. U.S. Postal Serv.*, 293 F. Supp. 2d 219 (E.D.N.Y. 2003) (dismissing claim where plaintiff failed to seek EEO counseling within forty-five days of the alleged discriminatory event); *Littlejohn,* 2003 WL 21738608 (dismissing Title VII discrimination claims for failing to meet the forty-five-day requirement)).

*see also Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("an employer who discriminates against its employee is unlikely to leave a well-marked trail").

The *McDonnell Douglas* burden-shifting framework allocates the burden of production in Title VII retaliation cases involving "single issue motivation" (claims where the only issue is whether the prohibited reason motivated the adverse action).[13] *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000); *Stoddard v. Eastman Kodak Co.,* 309 Fed. Appx. 475, 478 (2d Cir. 2009); *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 94 (2d Cir. 2001)*; Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities*, 115 F.3d 116, 119–20 (2d Cir. 1997); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). Under this framework, (1) plaintiff must first establish a *prima facie* case, (2) defendant then must articulate a legitimate, nondiscriminatory reason for the employment action, which shifts the burden back to (3) plaintiff to prove that this reason was a mere pretext for retaliation. *Lomotey v. State of Conn. Dep't of Transp.*, No. 09-CV-0466, 2009 WL 4430893, *2 (2d Cir. Dec. 4, 2009); *Stoddard,* 309 Fed. Appx. at 478; *Slattery,* 248 F.3d at 94; *see also Reeves,* 530 U.S. at 142;

---

[13] The parties effectively treat Laudadio's claims as a "single issue motivation" (or "pretext") case subject to *McDonnell Douglas* burden-shifting, as opposed to a "mixed-motive" case analyzed under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258 (1989) (plurality opinion), *superseded in part on other grounds by statute,* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074. In a "mixed-motive" case, the employer has to show that even if the retaliatory motive may have played a role, the employer would have made the same decision in the absence of such motive. *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039–40 (2d Cir. 1993); *Sulehria v. City of N.Y.*, No. 05-CV-4486 (SHS), 2009 WL 4036734, at *31 n.11 (S.D.N.Y. Nov. 23, 2009); *Smith v. Tuckahoe Union Free School Dist.*, No. 03-CV-7951 (PGG), 2009 WL 3170302, at *6 (S.D.N.Y. Sept. 30, 2009). The mixed-motive analysis, however, is only appropriate where plaintiff offers evidence of employer's retaliatory animus by, for example, producing such "smoking gun" evidence as policy documents, statements, clearly establishing the prohibited motive. *Bickerstaff*, 196 F.3d at 445–46; *Raskin v. Wyatt Co.*, 125 F.3d 55, 60–61 (2d Cir. 1997) (citations omitted); *Smith,* 2009 WL 3170302, at *6. In the absence of such evidence, Laudadio's claim should be treated as a "single issue motivation" case.

*McDonnell Douglas,* 411 U.S. at 93.  Regardless of the burden-shifting, however, plaintiff bears the ultimate burden of proving his case.  *T.X. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

**A.      Laudadio Established a *Prima Facie* Case of Retaliation**

To establish a *prima facie* case of retaliation, the plaintiff has to show by a preponderance of the evidence that (1) he engaged in protected activity, (2) the employer was aware of this activity, (3) the employer took adverse action against plaintiff, and (4) there exists a causal connection between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse action.  42 U.S.C. § 2000e-3(a); *White,* 548 U.S. at 56; *Matya v. United Refining,* 323 Fed. Appx. 65, 67 (2d Cir. 2009) (citation omitted); *Richardson v. Comm'n on Human Rts & Opportunities,* 532 F.3d 114, 123 (2d Cir. 2008) (citation omitted); *Terry*, 336 F.3d at 140–47 (analyzing *prima facie* of retaliation in the context of federal employment).  The plaintiff's burden of proof at the *prima facie* stage is *de minimis*, *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000), and the court will deny a defendant's motion for summary judgment where plaintiff has produced sufficient admissible evidence that would allow a rational fact-finder to infer a retaliatory motive, *Jute,* 420 F.3d at 173 (citation omitted).

Here, the government does not dispute that Laudadio engaged in and his supervisors knew about the protected activity in September 2003 and January 2004.  The government challenges only the third and forth prongs of the *prima facie* test, contending that the Leave Restriction was "at most, a trivial harm" and not an adverse action, and that there is no causal connection between the Leave Restriction and Laudadio's prior EEO activity due to lack of temporal proximity.  (Def's Mem. at 14–16.)  Both arguments are unpersuasive.

### 1) A Reasonable Jury May Find the Challenged Actions Materially Adverse

An adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 77 (citation and internal quotation marks omitted). To be "materially adverse," the employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities," for example, a demotion or loss of benefits. *Gentile v. Potter*, 509 F. Supp. 2d 221, 239 (E.D.N.Y. 2007) (citing *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). Engagement in protected activity does not "immunize [an] employee from those petty slights or minor annoyances that often take place at work." *White*, 548 U.S. at 68. At the same time, "[a] retaliation plaintiff need not [necessarily] show . . . economic harm, severe humiliation, or threats of violence." *Spector v. Bd. of Trs. of Cmty. Tech. Colls.*, 316 Fed. Appx. 18, 21 (2d Cir. 2009); *see also Preda v. Nissho Iwai Am. Corp.*, 128 F.3d 789, 791 (2d Cir. 1997) (holding that adverse action is not limited to "pecuniary emoluments" and may include retaliatory diminution of duties and exclusion from meetings and client outings).

An adverse action in a retaliation (as opposed to discrimination) claim may extend beyond employer's acts affecting employment, because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." *White*, 548 U.S. at 63; *see also Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007) (observing that under *White*, "Title VII's anti-retaliation provision is broader than that of its discriminatory action provision"); *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006). Ultimately, the "adverse action" determination is a fact-specific inquiry that "depends upon the circumstances of the particular case" because, as the

Supreme Court noted, a schedule change, for example, may be insignificant for many employees, "but may matter enormously to a [parent] with school-age children." *White*, 548 U.S. at 69, 71.

"A pattern of retaliatory harassment could rise to the level of a Title VII violation in certain circumstances." *Spector,* 316 Fed. Appx. at 21. The court can consider the alleged retaliatory actions collectively to determine whether such acts "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Edwards*, 2007 WL 2027913, at *11 (quoting *White*, 548 U.S. at 68) (internal quotation marks omitted). In *Edwards,* the court denied summary judgment on a retaliation claim where plaintiff was placed on an "Abusive Sick List," which required him to furnish a doctor's note to explain absences, when other employees were not required to do so. *Id.* at *11. Edwards also alleged the following retaliatory acts:

> (1) scrutiny of Edwards' work and job performance that exceeded the scrutiny to which employees who have not complained of discrimination are subjected . . . , (3) denying Edwards the chance to work overtime hours and in positions deemed 'out of class,' privileges granted to employees who have not complained of discrimination, (4) telling Edwards to 'get back to work,' an instruction not directed toward similarly situated employees who have not complained of discrimination, (5) forbidding Edwards from using his mobile phone during work hours, a prohibition not imposed on employees who have not complained of discrimination, and (6) failing to provide Edwards with tools and equipment provided to employees who have not complained of discrimination.

*Id.* at *10.

Here, Laudadio provides evidence of several instances of retaliatory conduct that arose after his first EEO counseling in September 2003. While the primary example of retaliation that the parties focus on is Laudadio's placement on Leave Restriction in July 2004, other alleged actions include the following:

> (1) he was subjected to ethnically derogatory remarks; (2) he was threatened [with being reassigned] to inspect poultry slaughtering . . . ; (3) he [was] denied annual leave; (4) he [was] denied performance appraisals; (5) he was wrongfully charged Absent Without Leave (AWOL) on four different occasions; (6) he was given a proposed [five]-day suspension; (7) his pay was wrongfully docked [forty] hours pursuant to the Family Medical Leave Act; (8) he was denied permission to go to court; and (9) he was unable to take his scheduled vacation.

(Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") at 18; Frank Decl., Ex. A at 133, 174: 18–23, F, O.) Laudadio also alleges that (10) his employer destroyed leave slips to justify AWOL charges, and (11) a supervisor threatened to shoot him if he had a gun. (Def.'s 56.1 Stmt. ¶¶ 25, 87; Pl.'s 56.1 Stmt. ¶¶ 25, 87.) Laudadio's Leave Restriction resembles the limitations of the "Abusive Sick List" in *Edwards.* Moreover, similar to *Edwards*, there are additional allegations of retaliation, which raises a question of material fact as to whether, taken collectively, all of these acts constitute an adverse action.

For the first time on reply the government argues that Laudadio's allegations are too insubstantial to establish an adverse action. (Reply Memorandum in Further Support of Defendant's Motion for Summary Judgment and in Response to Plaintiff's Opposition to Defendant's Motion for Summary Judgement ("Def's Reply") at 7–9.) Generally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" may be insufficient to establish a "materially adverse action." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (internal quotation marks and citation omitted). Additionally, "[r]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions." *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001). But in this case, Laudadio alleges a series of actions, and a reasonable juror could find

that the alleged acts taken collectively were not merely slights or justified reprimands, but materially adverse actions.

Defendant also argues that the alleged acts did not constitute "adverse action" because they did not in fact dissuade Laudadio from filing his second EEO complaint. (Def's Mem. at 15.) The "adverse action" test is objective: whether a reasonable employee would have filed the initial discrimination complaint if he had known that he would be subjected to the retaliation. *White*, 548 U.S. at 68–69. The rationale for application of an objective test to "adverse action" is that "[a]n objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68–69. Here, Laudadio's subjective perception of the alleged adverse action is not determinative, since a jury could find that a "reasonable employee facing the choice between [the retaliatory acts Laudadio alleges] and filing a discrimination complaint might well choose the former." *Id.* at 73. As such, summary judgment on this issue is inappropriate.

### 2) A Reasonable Jury May Find the Causal Link

To establish causation, a plaintiff has to prove that the retaliatory motive was "at least a substantial or motivating factor" in the adverse action. *Malacarne v. City Univ. of N.Y.*, 289 Fed. Appx. 446, 447 (2d Cir. 2008) (citation omitted). "Where multiple motives are possible, plaintiff does not have to show that a retaliatory motive was the *sole* cause . . . ." *Id.* (citation and internal quotation marks omitted). Disparate treatment cases like this rarely provide direct evidence of his employer's intent, and circumstantial evidence is particularly important. *Lomotey,* 2009 WL 4430893, at *1 (citation omitted). Thus, plaintiff can prove causation not only directly, by showing employer's retaliatory animus towards the plaintiff, but also indirectly, either by

showing temporal proximity (that the retaliatory treatment "followed closely" the protected activity), or "through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *Sulehria*, 2009 WL 4036734, at *12.

"Very close" temporal proximity of the employee's protected activity and employer's adverse action is indirect evidence of retaliation and may establish a causal link between these two events. *Breeden*, 532 U.S. at 273–74 ("[t]he cases that accept mere temporal proximity . . . uniformly hold that [it] must be "very close"); *Treglia v. Town of Manlius*, 313 F.3d 713, 720–21 (2d Cir. 2002); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 218 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998); *Gentile*, 509 F. Supp. 2d at 239 n.9.

There is no bright-line beyond which a temporal relationship is too attenuated to prove causation. *Gorman-Bakos v. Cornell Co-op. Ext. of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). *See, e.g., Chang v. Safe Horizons*, 254 Fed. Appx. 838, 39 (2d Cir. 2007) (finding that "almost" one-year gap established insufficient proximity); *Chamberlin v. Principi*, 247 Fed. Appx. 251, 54 (2d Cir. 2007) (finding that five-month gap established insufficient proximity); *Richardson v. N.Y. State Dept. of Correctional Serv.*, 180 F.3d 426, 446–47 (2d Cir. 1999) (holding that one-month gap established causation); *Quinn,* 159 F.3d at 769 (holding that two-month gap established causation). Second Circuit courts "have rejected finding a causal inference when there were gaps of three months, six months, eight months, one year, and eleven months between the filing of the complaint and the alleged retaliation." *Billue v. Praxair, Inc.*, No. 3:05-CV-00170 (JCH), 2007 WL 1231841, at *8 (D. Conn. Apr. 26, 2007).

Nevertheless, even where temporal proximity is weak, a reasonable trier of fact may infer the causal link between the protected activity and adverse action from other evidence. *Patane,* 508 F.3d at 115–16 (2d Cir. 2007) (finding that the plaintiff established causal connection where it is "not based only—or even primarily—on temporal proximity" and there may have been a one-year gap between the protected activity and the adverse action); *Jute,* 420 F.3d at 176 (reversing the grant of summary judgment for the employer where there were "significant lapses of time" between the protected activity and the adverse action, but there was other evidence allowing an inference of causation).

"[A] court may overlook a longer gap in time between protected conduct and an adverse employment action where the pattern of retaliatory conduct begins soon after [the protected activity] and only culminates later in [adverse action]." *Billue*, 2007 WL 1231841, at *8 (internal quotation marks and citations omitted); *Santiago v. Gen. Dynamics Elec. Boat Div.*, No. 3:04-CV-2062 (JCH), 2006 WL 3231413, at * 8 (D. Conn. Nov. 7, 2006) (same); *see also Clarke v. One Source Facility Servs., Inc.*, 168 F. Supp.2d 91, 99 n.5 (S.D.N.Y. 2001) (finding that even though "[p]laintiff was not actually terminated until long after he filed his first employment discrimination claim," the pattern of adverse actions established the *prima facie* case).

Here, Laudadio has shown an ongoing pattern of retaliatory conduct that is sufficient to establish the *prima facie* element of causation. Shortly after Laudadio participated in protected activity on September 12, 2003 and January 30, 2004, plaintiff was involved in a motor vehicle accident that prevented him from working between March 5 and April 19, 2004. (Def.'s 56.1 Stmt. ¶¶ 23, 24; Pl.'s 56.1 Stmt. ¶ 23,24; Pl.'s Mem. at 22; Frank Decl., Ex. F, V.) Immediately after returning to work, his supervisors allegedly began approving annual leave that was

improperly used to place him on Leave Restriction on July 22, 2004. (Frank Decl., Ex. J.) Other alleged retaliatory actions include, but are not limited to, the following: (1) in September 2003, he was threatened with being reassigned to an unpleasant work assignment where he would have to inspect poultry slaughtering, (2) in October 2003, he was denied Family Medical Leave (and was initially docked, but eventually received, forty hours pay as a consequence), (3) between October and November 2003, he was denied annual leave, (4) between September 2003 and January 2004, he was denied performance appraisals, (5) in April 2004, he was denied permission to go to court, (6) in or around April 2004, one of plaintiff's supervisors threatened to shoot him if he had a gun, (7) in May 2004, plaintiff was denied the ability to take vacation time, and (8) in July 2004, plaintiff was placed on Leave Restriction. (Pl.'s Mem. at 18; Frank Decl., Ex. A at 133, 174: 18–23, F and O.; Def.'s 56.1 Stmt. ¶¶ 25, 87; Pl.'s 56.1 Stmt. ¶¶ 25, 87.) Based on the totality of the circumstances, and especially the timing and ongoing nature of these allegedly retaliatory acts, a reasonable jury could infer a causal connection.

Laudadio has thus presented sufficient evidence to establish the *prima facie* case of retaliation, which shifts the burden of production to the government.

**B.      The Government Has Provided a Legitimate, Non-Retaliatory Reason**

Defendant's burden to provide a legitimate, non-retaliatory reason as a second step in *McDonnell Douglas* analysis is "one of production, not persuasion; it can involve no credibility assessment." *Reeves,* 530 U.S. at 142 (internal quotation marks and citation omitted). Once the employer completes the second step of the analysis and meets its burden of production in articulating a non-discriminatory reason for employment action, the presumption of retaliation "drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993). Here,

the defendant argues that the issuance of the Leave Restriction[14] (and anything stemming from it) was legitimate because plaintiff was "taking excessive amounts of unscheduled annual leave and continued to do so after he was warned." (Def.'s Mem. at 17.) The government has met its burden of production by providing a legitimate, non-retaliatory reason for issuing the Leave Restriction, which rebuts the presumption of retaliatory motive and shifts the burden of production back to Laudadio to prove pretext.

### C.    A Reasonable Jury May Find the Purported Reason Pretextual

As part of the third step in *McDonnell Douglas* analysis, plaintiff has to establish that the employer's reason for an adverse action was a pretext for retaliation. *Jute,* 420 F.3d at 173. To that end, plaintiff has to "provide sufficient evidence from which a reasonable factfinder could conclude that: 1) the defendant's alternative explanation is merely a pretext or a proffered reason that is not credited; and 2) the true motive was the illegal one argued by the plaintiff." *Walia,* 2008 WL 5246014, at *8 (citing *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1337–38 (2d Cir. 1997)) (internal quotation marks omitted). The plaintiff has to show that the prohibited factor was at least one of the motivating factors for the adverse action and does not have to show either that the employer's proffered reason was false or that this reason played no role in the employment decision. *Fields,* 115 F.3d at 120–21; *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). At this stage, the trier of fact may draw any inferences as to whether the employer's

---

[14] The government has only provided a legitimate non-retaliatory reason for issuing the Leave Restriction and the acts stemming from it (repeatedly placing plaintiff on AWOL and recommending a 5-day suspension) because it believes the other allegations are time barred. (Def's Mem. at 17–18.) However, as discussed above, plaintiff is not barred from relying on any allegedly retaliatory acts that took place after Laudadio sought EEO counseling. Thus, defendant has failed to meet its burden of production on Laudadio's other allegations. Accordingly, summary judgment with respect to those allegations should be denied.

reason is pretextual from the evidence establishing *prima facie* case. *Burdine*, 450 U.S. at 255 n.10.

Three factors call into question the legitimacy of the defendant's purported reason for the Leave Restriction. First, Laudadio argues that the majority of the purportedly abusive leave was pre-approved: of the thirty instances of prior "unscheduled leave" listed in the Leave Restriction, twenty-two instances reflected his authorized annual leave (totaling about two days), seven instances reflected his authorized sick leave (totaling about one and one-half days), and only one fifteen-minute occasion was unscheduled, which the plaintiff vigorously contested on other grounds.[15] (Frank Decl., Ex. J, W; Def.'s Mem. at 23–24; Pl.'s 56.1 Stmt. ¶ 32.) In opposition to defendant's motion, Laudadio has proffered an October 28, 2004 email from Deputy District Manager Michael Washington to William Kent, an ERB employee, stating that the Leave Restriction "will cause a problem legally. What occurred is annual leave *was approved* [and] then used as support to show an abuse . . . . The supervisor had the option of disapproving the annual leave request . . . ." (Frank Decl., Ex. R at 2.) (emphasis added). A reasonable jury could find that, as Washington admitted, Laudadio's use of annual leave could not be abusive if his supervisor, who had an opportunity to deny it, approved it in the first instance. (Frank Decl., Ex. R at 2.)

Second, Laudadio claims that defendant repeatedly ignored his attempts to recover the USDA Forms SF-71, which would allegedly show supervisors' approval of Laudadio's leave. (Frank Decl., Ex. S.) After plaintiff allegedly requested these documents several times, his supervisor notified him that these documents "were gone." (Frank Decl., Ex. A at 148, Ex. T.)

---

[15] Plaintiff claims that this fifteen minute AWOL charge resulted from the need to refill the air in the tire of the government vehicle assigned to Laudadio. (Frank Decl., W.)

The jury could also draw negative inferences from this fact rejecting the employer's purported reason for issuing the Leave Restriction.

Third, Laudadio's union contract provides that an abuse of *sick leave* may be used to place a restriction on *sick leave* usage,[16] but the contract is silent as to *annual* leave. The Leave Restriction limited, among other things, Laudadio's use of *annual* leave and was based on Laudadio's prior use of *annual* leave. (Frank Decl., Ex. J.) Washington admitted in his e-mail that the union contract did not necessarily support this restriction: "sick leave abuse is clearly defined. Annual Leave abuse is not" and "I do not know of any policy, directive, [or] guideline [which provides for] a restriction [to] be placed on annual leave." (Frank Decl., Ex. R at 2.) Based on the unprecedented nature of justifications and extent of limitations in Laudadio's Leave Restriction, a reasonable jury may infer that more likely than not a retaliatory motive played a role in this allegedly adverse action.[17]

_____

[16] Section 6 "Leave Restrictions" of the union contract states:

> In individual cases, if there is evidence that an employee's leave pattern gives sufficient reason that an abuse of sick leave exists, then employee shall be counseled that he or she may be placed on restricted *sick leave*. If the employee's leave pattern continues, the employee will be placed on a *sick leave* restriction, and advised in writing that a medical certificate must support all future requests for *sick leave*.

(Frank Decl., Ex. Q at 10.)

[17] Additionally, with respect to the AWOL charges and the suspension, Laudadio claims that his supervisors would ignore his phone calls to purposely frustrate his attempts to satisfy the Leave Restriction. This, coupled with the issues of fact surrounding the Leave Restriction, are sufficient to deny summary judgment with respect to these allegedly retaliatory acts. (Frank Decl., Ex. A at 93–94, 151– 52.)

Construing the evidence in the light most favorable to Laudadio as the non-moving party, I find that a rational jury could find that more likely than not the defendant's alleged actions were in retaliation for Laudadio's prior EEO activity. Accordingly, summary judgment is denied.

## CONCLUSION

For the reasons stated above, the government's motion for summary judgment is denied in its entirety. As discovery has closed, the parties are hereby ordered to submit a joint pretrial order to the assigned district judge no later than January 29, 2010.

**Dated: Brooklyn, New York**
      **January 8, 2010**

_Ramon E. Reyes, Jr._
**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**